# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case No. 20-Cr-10072-GAO** |
| ) | |
| **COREY GOLDBERG,** ) | |
| ) | |
| **Defendant.** ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States respectfully submits this sentencing memorandum in anticipation of sentencing, which is scheduled for October 11, 2022.  Consistent with the factors to be considered for the imposition of a sentence, including the advisory guideline sentencing range ("GSR") and the sentencing factors identified in 18 U.S.C. § 3553(a), the United States recommends that the Court sentence Corey Goldberg ("Goldberg") to a term of imprisonment of 52 months, a term of supervised release of three years, and a mandatory special assessment of $400.[1]

## I.     OFFENSE BACKGROUND

Goldberg was a methamphetamine distributor operating in Boston's Back Bay.  In August 2019, investigators with the DEA in New Hampshire received information from a confidential source ("CW-1") that Goldberg was distributing crystal methamphetamine to individuals in Massachusetts and New Hampshire, some of whom were then redistributing the

---

[1]  Goldberg has also agreed that a $4,000 forfeiture money judgment be entered against him and has agreed to forfeit $278,604.80 in lieu of forfeiting his condominium located at 230 Beacon Street, Unit B2, Boston, Massachusetts.  The Government has filed two motions for order of forfeiture (money judgment), which remain pending.  *See* ECF Dkt. 29 and 30.

drugs to other retail customers.  CW-1 stated that CW-1 had previously purchased crystal methamphetamine from Goldberg and that these sales took place at Goldberg's residence located at 230 Beacon Street, Unit B2, Boston, Massachusett (the "Goldberg Residence").  *See* PSR ¶ 8.

Thereafter, acting under the DEA's direction, CW-1 made three separate controlled purchases of methamphetamine from Goldberg at the Goldberg Residence.  Goldberg sold 56.2 grams of 100% pure methamphetamine hydrochloride during the first buy on August 23, 2019. Goldberg sold approximately one ounce (28 grams) of methamphetamine during the second buy on September 5, 2019.  Goldberg sold 28.2 grams of 99% pure methamphetamine hydrochloride during the third controlled buy on September 18, 2019.  Each of these controlled purchases were audio- and video-recorded.  *See generally* PSR ¶¶ 8–13.

Between October 12 and 15, 2019, CW-1 exchanged a series of text messages with Goldberg in which Goldberg agreed to sell four ounces of methamphetamine to CW-1 for $8,000.  Goldberg agreed to meet CW-1 on October 17, 2019, to complete the transaction. Subsequently, investigators executed a federal search warrant at the Goldberg Residence and seized from the kitchen counter 39.2 grams of 97% pure methamphetamine and from a safe in the bedroom 223.6 grams of 100% pure methamphetamine and 43 grams of 100% pure methamphetamine.  Investigators also seized other drug paraphernalia consistent both with drug distribution (*e.g.,* a digital scale with methamphetamine residue) and with personal usage (*e.g.,* glass smoking pipe and two plastic straws with white residue).  *See* PSR ¶¶ 14–15.

## II.    PSR AND ADVISORY SENTENCING GUIDELINES

Goldberg was initially charged in state court.  PSR ¶ 1.  He subsequently agreed to waive indictment and plead guilty to a four-count information, which charged him with distribution of 50 grams or more of methamphetamine in violation of 21 USC §§ 841(a)(1) and (b)(1)(A)(viii)

(Count One); distribution of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 USC §§ 841(a)(1) and (b)(1)(C) (Counts Two and Three); and possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 USC §§ 841(a)(1) and (b)(1)(B)(viii) (Count Four).  PSR ¶ 2.  As part of his plea agreement, Goldberg agreed to forfeit $278,604.80 in lieu of forfeiting his Back Bay condominium, and he agreed to entry of a separate judgment of $4,000 to cover the purchase money he received during the undercover investigation.  *See* ECF Dkt. 20 (Plea Agreement), at 5–6; ECF Dkt. 20-1 (Settlement Agreement).

The Probation Office determined that Goldberg's Total Offense Level is 27, and that Goldberg, who has no prior convictions, is a CHC I.  PSR ¶¶ 21–31.  As a result, Goldberg's advisory guideline sentencing range ("GSR") is 70–87 months.  PSR ¶ 63.  The parties agree with this calculation.

### III.    SENTENCING RECOMMENDATION

For the reasons that follow, the Government recommends that a sentence of imprisonment 52 months is warranted under the unique facts of this case.  In making this recommendation (which represents a 25% reduction from the applicable advisory guideline sentencing range), the Government notes first that Goldberg's criminal conduct was serious and involved the distribution of a dangerous and highly addictive drug that has been wreaking havoc in local communities.  At the same time, the Government recognizes that this case is unusual.  Goldberg is not a "typical" drug trafficker.  He is 47 years old, and this conviction marks his first and only interaction with the criminal justice system.  The Government's sentencing recommendation further seeks to account for the fact that Goldberg (who was gainfully employed and making over $100,000 per year from that employment) was severely addicted to

methamphetamine and has significant mental health issues.  Since his arrest, Goldberg appears to have taken strides to address the deficits in his life in a positive manner.

### A.    <u>Nature and Circumstances of the Offense</u>

Although historically there have not been a large number of methamphetamine prosecutions in this District, that is no longer the case.  After a steady decrease in methamphetamine use in the mid-2000s to mid-2010s, use of this potent stimulant has resurfaced in many parts of the country (including Massachusetts) as a serious problem.

Recent reports have confirmed that methamphetamine abuse is increasing dramatically. The National Institute of Health found that frequent methamphetamine use increased by 66% between 2015 and 2019.[2]  In 2020, around 2.6 million people aged 12 or older reported using methamphetamine in the past 12 months.[3]  National data from 2020 indicates that over three times as many individuals misused methamphetamine in the last month in comparison to heroin.[4] Moreover, fatal overdoses involving methamphetamine nearly tripled between 2015 and 2019.[5]

Equally devastating, as methamphetamine production has shifted from makeshift, local labs to sophisticated Mexican laboratories, methamphetamine production and purity have increased exponentially.[6]  According to the National Emerging Threats Initiative, seizures of

---

[2]  National Institute of Health, *Trends in U.S. methamphetamine use and associated deaths* (Oct 5, 2021), https://www.nih.gov/news-events/nih-research-matters/trends-us-methamphetamine-use-associated-deaths.

[3] Substance Abuse and Mental Health Services Administration (SAMHSA), *Results from the 2020 National Survey on Drug Use and Health* (Oct. 2021), https://www.samhsa.gov/data/sites/default/files/reports/rpt35325/NSDUHFFRPDFWHTMLFiles 2020/2020NSDUHFFR1PDFW102121.pdf.

[4]  *Id.*

[5]  Kara Grant, *The Rising, Devastating Trends in Meth Use,* Medpage Today (Sept. 22, 2021), https://www.medpagetoday.com/psychiatry/addictions/94645.

[6]  Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*, The New York Times (Feb. 13, 2018), https://www.nytimes.com/2018/02/13/us/meth-crystal-drug.html (hereinafter, "Frances Robles, *Meth, the Forgotten Killer, is Back.  And It's Everywhere*").

methamphetamine have skyrocketed from 7,874 kilograms in 2011 to 67,757 kilograms in 2018.[7]
The purity of methamphetamine has risen to nearly 100 percent according to 2022 reports.[8]  As
the New York Times has reported, this combination of increased production and increased purity
has been particularly lethal:  "There is more meth on the streets today, more people are using it,
and more of them are dying."[9]

Methamphetamine abuse varies according to the region.  Although the substance abuse
crisis in Massachusetts is most often linked to opioids, methamphetamine and stimulant use have
spiked over the past several years.[10]  Geographically, the largest increase in death rates from
2018 to 2019 involving psychostimulants occurred in the Northeast (43% increase).[11]  In
Massachusetts in 2020, there were 1,124 deaths from stimulants and 103 were attributed to
methamphetamine.[12]

In 2021, officials announced that methamphetamine seizures by law enforcement climbed
between 1,700 and 2,900 percent from 2010 to 2019.[13]  The National Drug Threat Assessment
released by the DEA in 2020 explained that drug cartels are actively pursuing new markets in the

---

[7]  Martha Bebinger, *Seizures of Methamphetamine Are Surging in the US*, NPR (July 29,
2019), https://www.npr.org/sections/health shots/2019/07/29/745061185/seizures-of-
methamphetamine-are-surging-in-the-u-s.

[8]  Destiny Bezrutczyk, *The Steep Price of Addiction*, Addiction Center (Jan. 31, 2022),
https://www.addictioncenter.com/drugs/how-much-do-drugs-cost/.

[9]  Frances Robles, *Meth, the Forgotten Killer, is Back.  And It's Everywhere.*

[10]  Martha Bebinger, *As Stimulant Use and Deaths Increase, Mass. Launches
Commission to Find Solutions*, WBUR (Dec. 9, 2021),
https://www.wbur.org/news/2021/12/09/as-stimulant-use-and-deaths-increase-mass-launches-
commission-to-find-solutions

[11]  *Commission on Methamphetamine Use Final Report SD.3138,* 192nd General Court of
the Commonwealth of Massachusetts (2021) https://malegislature.gov/Bills/192/SD3138.

[12]  *Id.*

[13]  Matt Murphy, *Massachusetts Not Ready for Rise in Cocaine, Meth Use*, Mass Live
(May 5, 2021), https://www.masslive.com/news/2021/05/massachusetts-not-ready-for-rise-in-
cocaine-meth-use.html.

Case 1:20-cr-10072-GAO    Document 56    Filed 10/07/22    Page 6 of 9


United States, including the Northeast, due to competition.[14]  Recent media reports confirm that

methamphetamine usage in Massachusetts has been notably increasing.[15]

Even when not lethal, the physical and emotional effects of methamphetamine abuse are

dramatic.  Methamphetamine has a horrific impact on its users and on the community.

Methamphetamine is a tremendously addictive drug, which can cause dramatic physical and

emotional changes on those who use it, including increases in aggressive and violent behavior.[16]

The physical effects on users are well-documented.  The emotional changes are equally

devastating:

> Chronic abusers may exhibit symptoms that can include significant anxiety,
> confusion, insomnia, mood disturbances, and violent behavior.  They also may
> display a number of psychotic features, including paranoia, visual and auditory
> hallucinations, and delusions (for example, the sensation of insects creeping under
> the skin).  Psychotic symptoms can sometimes last for months or years after a
> person has quit abusing methamphetamine, and stress has been shown to precipitate
> spontaneous recurrence of methamphetamine psychosis in formerly psychotic
> methamphetamine abusers.[17]

**B.**     **Need to Promote Respect for the Rule of Law, Provide Just Punishment for the Offense, and Afford Adequate Deterrence**

As the above discussion makes clear, there is a compelling need to deter individuals who

may be inclined to participate in drug trafficking—particularly substances as dangerous as

---

[14]  Drug Enforcement Administration, *National Drug Threat Assessment* (Mar. 2021), https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

[15]  *See* Shira Schoenberg, *Meth Use Poses Rising Threat in Massachusetts,* CommonWealth (May 6, 2022), https://commonwealthmagazine.org/drug-addiction/drugs/meth-use-poses-rising-threat-in-massachusetts/

[16]  Mark A. R. Kleiman, Jonathan P. Caulkins, and Angela Hawken, *Drugs and Drug Policy: What Everyone Needs to Know* 120 (Oxford University Press 2011) ("There is . . . a much stronger association between violence and regular methamphetamine use.  Heavy use of methamphetamine increases the likelihood of attack behaviors and aggression, with the most compelling evidence coming from laboratory studies involving mice.")

[17]  National Institute on Drug Abuse, *What are the long-term Effects of Methamphetamine Abuse (*Apr. 7, 2017), https://www.drugabuse.gov/publications/research-reports/methamphetamine/what-are-long-term-effects-methamphetamine-abuse.

methamphetamine—for profit.  On the other hand, the Government recognizes that Goldberg's participation appears to have been fueled, at least in part, by his own addiction and that, until Goldberg's use of methamphetamine, he appears to have been living a law-abiding life.  This, of course, does not excuse Goldberg's conduct, which harmed the other individuals who purchased and used the drugs he distributed.  The sentence imposed on Goldberg must be balanced to account for his personal circumstances, the need to deter Goldberg from additional attempts to distribute narcotics, and to deter others from doing the same.

### C.   Defendant's Background

Goldberg is 47 years old.  He has a Bachelor of Arts degree in Economics from the University of New Hampshire (which he received in 1997) and a master's degree in Computer Information Systems from Boston University (which he received in 2006).  PSR ¶ 57.  Since 2008, Goldberg has had several professional jobs in which he was employed as a software or automation engineer with a yearly annual salary in excess of $100,000.  *See* PSR ¶ 58.

Goldberg has a 30-year history of significant mental health issues, which are described in paragraphs 51 through 53 of the PSR.  Goldberg also has a long history of drug use.  He began smoking marijuana at age 16 and from age 18 to 30, he smoked marijuana daily.  Thereafter, until the time of his arrest, he smoked marijuana about once a week recreationally.  More significantly, Goldberg began using methamphetamine at approximately age 40.  By the time of his arrest (approximately five years later), Goldberg was using two to five grams of methamphetamine daily to alleviate his depression.[18]  *See generally* PSR ¶¶ 54–55.

---

[18] For all practical purposes, it does not appear that Goldberg's addiction affected his work history as he had multiple jobs in which he earned more than $100,000 while abusing methamphetamine.

Goldberg receives weekly substance abuse treatment through Hope House and meets with his psychiatrist every month.  Goldberg appears to consistently attend treatment, which appears to be beneficial.  *See* PSR ¶ 53.

## V.    CONCLUSION

Goldberg's sentencing presents an unusual case.  Goldberg apparently did not begin using methamphetamine until he was in his 40s.  His drug trafficking activities similarly did not start until his 40s.  Although Goldberg was severely addicted to methamphetamine, it does not appear that he was selling methamphetamine to support his habit.  To the contrary, Goldberg had saved considerable assets from his professional employment.

Since his arrest, Goldberg has engaged in significant mental health and drug treatment, apparently with some success.  Given his age, personal history, and success during treatment, the Government believes that Goldberg's risk of recidivism is small.  At the same time, his criminal activity cannot be excused or ignored.

Imposition of sentence in this case thus requires a careful balancing of countervailing factors.  Consistent with the various factors set forth in 18 U.S.C. § 3553(a), the Government respectfully recommends that the Court impose a sentence in the range of 52 months in prison and a term of supervised release of three years.  Payment of a $400 special assessment is also required.  Finally, orders of forfeiture as set forth in the pending motions for forfeiture, *see* ECF Dkt. 29 and 30, should be entered.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:     */s/ James E. Arnold*
JAMES E. ARNOLD
Assistant U.S. Attorney

8

<u>Certificate of Service</u>

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u> /s/ James E. Arnold</u>
JAMES E. ARNOLD

Date:  October 7, 2022.